UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| |
|---|
| TROY D., and O'NEILL S.,<br><br>   Plaintiffs,<br><br>  v.<br><br>MICKENS, et al.,<br><br>   Defendants. |

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 10-2902
(JEI/AMD)

**OPINION**

**APPEARANCES:**

DECHERT LLP
By:  Bruce W. Clark, Esq.
902 Carnegie Center
Suite 500
Princeton, NJ 08540
 Counsel for Plaintiffs

OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
By: Susan Marie Scott
RJ Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625

  and

MICHAEL J. LUNGA, ESQ., LLC
By: Michael J. Lunga Esq.
23 Vreeland Road
Suite 23
Florham Park, NJ 07932
 Counsel for Defendants

**IRENAS**, Senior District Judge:

 Plaintiffs Troy D. ("Troy") and O'Neill S. ("O'Neill")

initiated this action seeking compensatory and punitive damages,

and declaratory and injunctive relief, for injuries they suffered

while in the custody of the New Jersey Juvenile Justice
Commission ("JJC").[1]  Plaintiffs allege that they were subjected
to excessive room isolation and deprived of necessities such as
medical care, mental health treatment, proper clothing, and
nutrition, in violation of their substantive and procedural due
process rights under the Fourteenth Amendment of the United
States Constitution.[2]  Pending before the Court are Motions to
Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), or in the
alternative, Motions for Summary Judgment pursuant to Fed. R.
Civ. P. 56 by the Mental Health Providers and by the JJC
Defendants.[3]

---

[1]  The JJC was created pursuant to Governor Christine Todd
Whitman's Juvenile Justice Reform Legislation codified at
N.J.S.A. 52:17B-169 et seq.  The JJC is "responsible for
operating State services and sanctions for juveniles involved in
the juvenile justice system and responsible for developing a
Statewide plan for effective provision of juvenile justice
services and sanctions at the State, county and local level . . .
."  N.J.S.A. 52:17B-169(k).

[2]  The Court exercises subject matter jurisdiction pursuant
to 28 U.S.C. §§ 1331 and 1367(a).

[3]  The Mental Health Providers are psychologists with the
University Correctional HealthCare ("UCHC") within the University
of Medicine and Dentistry of New Jersey ("UMDNJ").  (*See* Am.
Compl. ¶ 67-74.) The Mental Health Providers are represented by
Michael Lunga, Esq. with respect to Troy's lack of medical care
claim pursuant to 42 U.S.C. § 1983 and medical negligence claim.
(*See* JJC Defs' Br. in Support at 39 n.8.)
    The New Jersey Attorney General ("NJAG") represents the
Mental Health Providers on all other claims.  The NJAG also
represents the JJC Defendants, which include: Administrators of
facilities operated by JJC; Shift Commanders at facilities
operated by JJC; correctional officers at the Juvenile Medium
Security Facility ("JMSF Correctional Officers"); correctional

**I.**

**A.**

On February 25, 2009, Troy, then 15 years old, was
adjudicated delinquent by the Superior Court of New Jersey and
committed to the custody of the JJC.[4]  (Am. Compl. ¶ 75.)  Troy
remained in custody until October 7, 2009, for a total of 225
days.[5]  (*Id.* at ¶ 81.)  For approximately 178 to 188 of those
days, Troy was held in isolation under a special observation
status requiring close or constant watch, purportedly for his own
safety.  (*Id.* at ¶ 82; JJC Defs' Br. in Support at 17-18.)

On February 27, 2009, O'Neill, then 16 years old, was

_____

officers at the New Jersey Training School ("NJTS correctional
officers"); Disciplinary or Courtline hearing officers; staff
from the JJC Office of Specialized Interagency Services ("OSIS
Staff"); Correctional Officer, Jeffrey Saville; Chairman of the
New Jersey State Parole Board, James Plousis; Deputy Executive
Director for Operations of the JJC, Felix Mickens; and Executive
Director of the JJC, Veleria Lawson (collectively, the "JJC
Defendants").

[4]  Troy was adjudicated delinquent on three counts of
violation of probation, fourth degree criminal sexual contact,
two counts of fourth degree aggravated assault, third degree
aggravated assault, and third degree criminal restraint.  (Lemane
Cert. Ex. A.)

[5]  Troy spent a majority of the time confined at the
Juvenile Medium Security Facility ("JMSF") in Bordentown, New
Jersey, but was also confined for shorter periods of time at the
Juvenile Reception and Assessment Center ("JRAC") and the New
Jersey Training School ("NJTS").  (Am. Compl. ¶ 78.)  JMSF, JRAC
and NJTS are all JJC-operated facilities.  (*Id.* ¶¶ 28-29.)

adjudicated delinquent for conspiracy to distribute CDS[6] and committed to the custody of the JJC.[7]  (*Id.* at ¶ 121.)  Between June 2009 and October 2010, O'Neill was held in isolation for approximately 50 days, awaiting hearings for alleged disciplinary violations.[8]  (*Id.* at ¶ 126.)  The practice of isolating juveniles prior to disciplinary hearings is referred to as "pre-hearing room restriction."  (*Id.* at ¶ 128.)

While Plaintiffs were placed in isolation for different reasons, the conditions they experienced were similar.  Each was confined to a seven-foot-by-seven-foot room and allowed out only for hygiene purposes.  (*Id.* ¶¶ 86, 170.)  The rooms contained

---

[6]  The Court understands "CDS" to refer to controlled dangerous substances, notwithstanding Plaintiffs' characterization of O'Neill's offense as "conspiracy to distribute compact discs."  (Am. Compl. ¶ 121.)  While the Court acknowledges the potential danger of modern pop music, it will not reach the Justin Bieber question and instead make the reasonable inference that O'Neill's offense was drug-related.

[7]  O'Neill was initially placed in the Ocean Residential program, a non-secure community home offering substance abuse treatment.  (Am. Compl. ¶ 122.)  However, after leaving the campus without permission, O'Neill was adjudicated delinquent for escaping his placement and sent to JMSF.  (*Id.* at ¶¶ 123-24.) O'Neill remained at JMSF until he was transferred to NJTS, where he currently remains in custody.  (*Id.* ¶ 125.)

[8]  According to the Amended Complaint, following repeated assaults by other JMSF residents, O'Neill was unjustifiably punished by being placed in isolation.  (Am. Compl. ¶ 173.) O'Neill was also allegedly confined in isolation for days at a time for minor violations such as possession of a pen, cursing and horseplay in the shower.  (*Id.* ¶¶ 131, 152, 165.)

only a concrete bed slab, a toilet, a sink, and a mattress pad.[9] (*Id.* ¶¶ 87, 170.)  Troy was allegedly held in extreme cold, while O'Neill was allegedly isolated for four days in extreme heat. (*Id.* ¶¶ 88, 155.)  Both Plaintiffs were denied any educational materials or programming, and were prevented from interacting with their peers.  (*Id.* ¶¶ 86, 170.)

In addition, Plaintiffs were allegedly denied mental health treatment during their periods in isolation.  Troy was scheduled for twice a week treatment sessions as part of his delinquency adjudication for a sex offense. (*Id.* ¶ 96.)  However, while Troy was under close or constant watch, he was given only approximately six of those treatment sessions and received only nine other individual therapy sessions. (*Id.* ¶ 97.)  While a mental health clinician checked on Troy every day to assess his classification status as a part of daily rounds, these visits, conducted through the door of his cell, lasted an average of twelve minutes and involved only basic questions about Troy's mental state.  (*Id.* ¶¶ 98-99.)  Around the anniversary of his mother's death, Troy made requests for counseling that were

---

[9]   The physical conditions of Troy's isolation appear to have been harsher than O'Neill's. Troy's mattress pad was often removed, a light remained on for 24 hours a day, and he was often required to wear a bulky, sleeveless smock. (Am. Compl. ¶¶ 87-88.)

denied.[10]   (*Id.* ¶ 100.)

O'Neill was also deprived of therapeutic mental health treatment while in isolation.  (*Id.* ¶ 171.)  Between June 29, 2010 and July 2, 2010, O'Neill asked to speak to a counselor, but was told that counselors did not visit that part of the building. (*Id.* ¶ 154.)  Like Troy, O'Neill was visited by mental health clinicians on daily rounds, but these visits only assessed whether O'Neill was experiencing distress.[11]  (*Id.* ¶ 171.)

The Amended Complaint further alleges that both Plaintiffs were deprived of other necessary medical treatment.  On several occasions, Troy was injured when JJC staff used force to restrain him, and his injuries were allegedly inadequately treated.  (*Id.* ¶ 112.)  O'Neill was similarly denied medical treatment, and on one occasion suffered for four days with a broken jaw before getting medical attention.  (*Id.* ¶ 150.)

Both Plaintiffs sought to be removed from isolation.  Troy frequently made requests to JJC staff that he be removed from

_____

[10]   Troy's mother died of a drug overdose when Troy was 10 years old. (Lemane Cert. Ex. C. at 1 of 7.)  Since the age of three, Troy had been in the custody of Cumberland County DYFS. (*Id.* at 2 of 7.)

[11]   In an August 2, 2010 letter, Defendant Mickens stated "[t]here is no affirmative record indicating that Resident [O'Neill] was treated by Mental Health personnel during the four days he was assigned to UH-5.  Even though JJC policy requires that residents on restricted status be seen regularly . . . mental health records did not have any record of visiting him at the time in question."  (Am. Compl. ¶ 154.)

6

close or constant watch.  (*Id.* ¶¶ 100-101, 107.)  Such requests
were denied and Troy was told that additional requests would
result in longer periods of isolation. (*Id.* ¶ 100.)  The Amended
Complaint alleges that there were no avenues available for
Plaintiffs to file formal grievances and that attempts by O'Neill
to obtain information on appeals procedures were met with threats
of longer periods of isolation.  (*Id.* ¶¶ 156, 175.)

O'Neill appealed some of the decisions to place him in
isolation, but the treatment team upheld each decision that he
appealed.[12]  (*Id.* ¶¶ 157, 159, 164.)  On March 10, 2010, an
attorney with the Children's Justice Clinic at Rutgers School of
Law--Camden wrote to Defendant Thomas, Superintendent of JMSF,
that isolation was being used for O'Neill excessively and
inappropriately.  (*Id.* ¶ 147.)  O'Neill also sought to address
the conditions of his confinement before the Superior Court of
New Jersey, but the court ruled that it had no jurisdiction to
consider the matter.[13]  (*Id.* ¶ 176.)

The Amended Complaint alleges that the periods of prolonged
isolation experienced by Plaintiffs were responsible for the
deterioration of their mental states.  (*Id.* ¶¶ 102-104, 170-172.)

_____

[12]  O'Neill appealed six of the eighteen disciplinary
sanctions.  (Lemane Cert. Ex. E at 34-35.)

[13]  O'Neill's access to the courts was also allegedly
limited by the fact that he did not have access to any post-
disposition advocate.  (Am. Compl. ¶ 178.)

Throughout his confinement, Troy attempted to commit suicide and engaged in other destructive behavior including: cutting himself using caulk or tile from the floor or walls, banging his head against the wall, urinating out of his cell, and smearing feces on the walls.  (*Id.* ¶¶ 102-104, 106.)  According to the Amended Complaint, "isolation was contra-indicated for Troy because he had a history of mental illness, psychiatric hospitalizations, self-harm and suicidal actions."[14]  (Am. Compl. ¶ 109.)

On September 30, 2009, the Children's Justice Clinic of Rutgers School of Law-Camden filed a motion on behalf of Troy in the Superior Court of New Jersey, Chancery Division, Family Part, in Cumberland County, seeking to have Troy immediately transferred to a psychiatric hospital.  (*Id.* ¶ 116.)  The motion argued that Troy's mental health problems were exacerbated by the excessive isolation, the lack of mental health treatment, and lack of educational materials.  (*Id.*)  On October 7, 2009, Troy was moved to Trinitas Psychiatric Hospital.  (*Id.* ¶ 117.)  In late October 2009, Troy was transferred to the Carrier Clinic, a Residential Treatment Center in Bell Meade, New Jersey, and is no longer in JJC custody.[15]  (*Id.* ¶¶ 119-20.)

---

[14]  During his confinement, medical records show that Troy was medicated with Zoloft, Abilify, Atarax.  Prior medications included Depakote, Prozac, and Thorazine.  (Lemane Cert. Ex. C. at 3 of 114; 1 of 7.)

[15]  On October 15, 2009, the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, vacated its

O'Neill remains in the custody of the JJC. (*Id.* ¶ 124.)

**B.**

On June 7, 2010, Troy initiated this action by filing the Complaint in this Court.  On December 2, 2010, an Amended Complaint was filed, adding O'Neill as a Plaintiff, along with additional Defendants and causes of action.

Plaintiffs' First and Seventh Counts allege substantive due process violations for unconstitutional conditions of confinement, failure to protect and lack of medical care pursuant to 42 U.S.C. § 1983.[16]

The Second and Eighth Counts assert claims under the New Jersey Civil Rights Act against all Defendants, except Defendants Lawson and Plousis.

The Third and Eleventh Counts are facial constitutional challenges to N.J.A.C. §§ 13:101-6.17(e), 13:101-6.6(c), and 13:101-8.1(a), against Defendant Lawson in her official capacity. The Twelfth Count is against Defendant Plousis in his official capacity and alleges that the New Jersey Parole Board's policy of prohibiting attorneys at juvenile parole hearings is facially unconstitutional because it denies procedural due process.

_____

order committing Troy to JJC custody.  (Am. Compl. ¶ 118.) According to the Amended Complaint, Troy currently resides in the Cumberland County Juvenile Detention Center.  (*Id.* ¶ 22.)

[16]  Only Plaintiff Troy brings a claim for lack of medical care.

The Fourth and Ninth Counts allege violations of procedural due process pursuant to 42 U.S.C. § 1983 in the use of pre-hearing room restriction, temporary close custody and special observation status.

The Sixth and Thirteenth Counts allege negligence against all Defendants.

On April 4, 2011, the JJC Defendants and the Mental Health Providers filed Motions to Dismiss or, in the alternative, Motions for Summary Judgment.  The Mental Health Providers have incorporated the arguments made by the JJC Defendants in their Motion.

## II.

The Mental Health Providers and the JJC Defendants each move to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted and, because reference is made to documents outside the pleadings, for summary judgment.[17] Because the Court relies on documents outside of the pleadings,

---

[17]   Although discovery has not yet commenced, Defendants have submitted with their Motions the following evidence: (1) Troy's medical records; (2) evidence of Troy's commitment status; (3) records of Troy's health and discipline during the course of his commitment; (4) forms assigning Troy to close or constant observation status; (5) records of O'Neill's health and discipline during the course of his commitment; and (6) handbooks for residents at JJC-operated facilities.  The record before the Court does not include any deposition testimony or any medical expert reports.

and Defendants have moved in the alternative for summary judgment, the Court will treat the pending motions as motions for summary judgment.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).

The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**III.**

As will become evident in the Court's consideration of
Defendants' arguments with respect to each of Plaintiffs' claims,
summary judgment on many of the issues in this case is premature.
The factual record is undeveloped and thus the Court is not able
to undertake the fact-intensive inquiry demanded by Plaintiffs'
constitutional claims.  With this in mind, the Court will now
turn to the specific arguments made by Defendants in support of
their Motions.

**A.**

Defendants argue that O'Neill's § 1983 claims are barred by
his failure to exhaust administrative remedies as required by the
Prisoner Litigation Reform Act ("PLRA").[18]  Failure to exhaust is
an affirmative defense which defendants bear the burden of
proving.  *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

The PLRA provides that "[n]o action shall be brought with

_____

[18]   In their Motion for Leave to File a Sur-Reply,
Plaintiffs clarify that Troy was not a prisoner for PLRA purposes
when he initiated this action.  Defendants concede that Troy is
not subject to the PLRA.  (JJC Defs' July 7, 2011 Ltr.) Once a
prisoner is released from detention, the prisoner is no longer
subject to the PLRA.  *Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d
Cir. 2002); *see also Greig v. Goord*, 169 F.3d 165, 167 (2d Cir.
1999) ("[L]itigants. . . who file prison condition actions after
release from confinement are no longer 'prisoners' for purposes
of § 1997e(a) and, therefore, need not satisfy the exhaustion
requirements of [the] provision.").
    Accordingly, Plaintiffs' Motion for Leave to File a Sur-
Reply (Dkt. No. 33) will be granted and Defendants' Motion with
respect to Troy's failure to exhaust administrative remedies will
be denied.

respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Under the PLRA, a prisoner is "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  *Id.* at § 1997e(h); *see also Alexander S. v. Boyd*, 113 F.3d 1373, 1384 (4th Cir. 1997)(explaining that PLRA prisoner definition includes those incarcerated in juvenile detention facilities).

O'Neill is subject to the PLRA's administrative exhaustion requirement because he was adjudicated delinquent on February 7, 2009, and remained in custody when added to this suit.  (Am. Compl. ¶¶ 121, 125.) Thus, the PLRA requires that O'Neill exhaust his administrative remedies before pursuing his claims in this Court.

In order to comply with the PLRA, prisoners must have properly exhausted available administrative remedies before filing suit.  *Woodford v. Ngo*, 548 U.S. 81, 94 (2006).  Because prison grievance procedures determine what steps are required for exhaustion, the exhaustion analysis begins with an examination of prisoner regulation and handbooks.  *Williams v. Beard*, 482 F.3d

13

637, 639 (3d Cir. 2007); *Womack v. Smith,* 310 Fed. Appx. 547, 550
(3d Cir. 2009).  "[C]ompliance with the administrative remedy
scheme will be satisfactory if it is substantial." *Spruill*, 372
F.3d at 232 (quoting *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir.
2000)).

Each juvenile confined at JJC-operated facilities receives
two Handbooks: a "Handbook on Discipline" (hereinafter
"Discipline Handbook") and a "Juveniles' Handbook of Rules and
Regulations" (hereinafter "Rules Handbook").  (*See* Lemane Cert.
Ex. F.)  Plaintiffs received each of these Handbooks.  (*Id.*)

Defendants point to three administrative remedies that
O'Neill was required to exhaust prior to filing suit.  First,
they argue that O'Neill was required to submit completed Special
Classification Request Form J081 to a social worker.  (JJC Defs'
Br. at 14 (citing N.J.A.C. 13:95-8.5).)  However, this grievance
procedure is not included in either of the Handbooks that were
provided to O'Neill.  While Defendants cite to the N.J.A.C. as
containing this provision, they fail to point to any evidence
demonstrating that they made reasonable efforts to make O'Neill
aware of this process in any way.

Absent any evidence that juveniles at JJC-operated
facilities were educated about this procedure or had access to
the materials necessary to utilize it, the Court cannot find this
to be an available remedy that O'Neill was required to exhaust.

14

*See Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir.
2003)(administrative remedy unavailable where prison officials
did not provide the required grievance forms)*; see also Goebert
v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007)(holding that
an administrative remedy "which is unknown and unknowable is
unavailable"); *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir.
2004)(applying objective test examining whether a "similarly
situated individual of ordinary firmness" would have deemed a
particular remedy to be available).  Defendants have not met
their burden of proving that O'Neill failed to exhaust this
administrative procedure.

Next, Defendants argue that O'Neill was required to appeal
each disciplinary sanction that resulted in his placement in
isolation within 48 hours of being provided written notice of
each.  (JJC Defs' Br. at 14.)  With respect to appeals of
disciplinary decisions, the Discipline Handbook provides:

> The juvenile shall be advised in writing by
> the Treatment Team of the opportunity to
> appeal to the Superintendent or his or her
> designee, who shall be an Assistant
> Superintendent, at the time the juvenile is
> provided with the disciplinary decision.
> Juveniles shall have 48 hours from receipt of
> the disciplinary decision to make such appeal.

(Lemane Cert. Ex F. at 116/151.)

The Court finds that Defendants have not met their burden of
demonstrating that O'Neill failed to exhaust with respect to this
administrative grievance procedure.  In order to trigger a

juvenile's right to appeal, the juvenile must "be advised in writing by the Treatment Team of the opportunity to appeal . . . ."  Defendants have presented no evidence that O'Neill was notified in writing of his opportunity to appeal each of the disciplinary sanctions imposed against him.  Therefore, absent written notification of the disciplinary decision and his right to appeal, O'Neill's time to appeal was never triggered.[19]

Finally, Defendants argue that O'Neill was required to submit a complaint to the Ombudsman in accordance with the Rules Handbook.  (JJC Defs' Br. at 13-14.)  The section titled "Ombudsman," provides:

> An ombudsman is available to juveniles to register their complaints and air their grievances.  The ombudsman will investigate the issues and assist to resolve or achieve a fair settlement on issues at the institutional level.  The ombudsman has a mailbox located within the institution for juveniles to submit their complaint.

(Lemane Cert. Ex. F. 134/151.)

Plaintiffs argue that O'Neill properly exhausted when an

---

[19]   Moreover, in light of the nature of O'Neill's claims in this suit--that the conditions of isolation and the process of placing him on pre-hearing room restriction violated his constitutional rights--it is not even clear to this Court that appealing the reason he was placed in pre-hearing room restriction is required prior to filing suit.  Neither of the Handbooks explicitly addresses administrative grievance procedures, and in the absence of clear guidance for what a juvenile must do to satisfy proper administrative exhaustion, this Court concludes that this particular appeals process is not a mandatory step in addressing the legal issues presented by O'Neill's claims.

attorney from the Children's Justice Clinic at Rutgers School of
Law-Camden wrote a letter to Defendant Linda Thomas,
Superintendent of JMSF, complaining on behalf of O'Neill that
isolation was being used "excessively and inappropriately."[20]
(Am. Compl. ¶ 147.)  Defendant Veleria Lawson, JJC Executive
Director, responded that she would look into the matter and
copied Defendant Felix Mickens, Deputy Executive Director for JJC
Operations, on her response.  (*Id.*)

     The Court concludes that this letter demonstrates proper
exhaustion of the Ombudsman grievance process, which requires a
juvenile to present his grievances so that they may be
"investig[ated]" and "resolve[d]" "at the institutional level."
The letter sent to Defendant Thomas on O'Neill's behalf presented
such an opportunity.  (*See* Am. Compl. ¶ 147 (ultimate
administrative authorities at JJC responded that they would
investigate the matter.))  Thus, Defendants were afforded, and
took advantage of, the opportunity to address O'Neill's claims.[21]

     This Court's conclusion comports with the policy goals of

_____

     [20]  Defendants do not address this letter at all in any of
their motion papers.

     [21]  Even if this Court were to find that O'Neill did not
properly comply with the Ombudsman process, it appears that
Defendants have waived their defense because JJC's ultimate
administrative authorities agreed to investigate his complaints.
*See Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000)(exhaustion
defense is waived where highest administrative authority examines
the grievance on the merits).

the PLRA in that the letter gave the facility "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court" and demonstrates a reasonable attempt at compliance with JJC procedures. *Woodford*, 548 U.S. at 89 (internal quotations omitted). Moreover, the allegations in this case do not resemble the frivolous claims Congress sought to "filter out" in enacting the PLRA. *See Porter v. Nussle*, 534 U.S. 516, 524-35 (2002).

Therefore, the Court finds that O'Neill properly exhausted available administrative remedies. Accordingly, Defendants' Motions will be denied with respect to their affirmative defense of failure to exhaust.

**B.**

The Complaint asserts substantive due process violations for conditions of confinement, failure to protect from harm and lack of mental health care. The Complaint also asserts procedural due process violations for the use of room restriction for O'Neill, and for the use of close custody and special observation statuses for Troy. In addition, Plaintiffs bring facial constitutional challenges to the New Jersey Parole Board's policy of denying access to counsel at juvenile parole hearings and to specific provisions in the New Jersey Administrative Code.[22]

_____

[22] The challenged provisions of the N.J.A.C. were promulgated by the JJC pursuant to the grant of authority in N.J.S.A. § 52:17B-170(e)(22).

18

The Court will first consider Plaintiffs' facial constitutional challenges.  Then the Court will turn to Plaintiffs' conditions of confinement, failure to protect and lack of medical care claims before evaluating Plaintiffs' procedural due process violations.

**1.**

Count Three is a facial constitutional challenge on Fourteenth Amendment substantive due process grounds to N.J.A.C. 13:101-6.17(e), which provides:  "[n]othing in this section shall prevent the placement of a juvenile in room restriction for the minimum time necessary to eliminate an immediate threat to the safety of either the juvenile, staff or other juveniles, or to the orderly operation of the facility."  According to the Amended Complaint, this provision is facially unconstitutional because it "impermissibly permits a juvenile to be secluded in isolation for an indefinite period of time."  (Am. Compl. ¶ 269.)

Count Eleven is a facial constitutional challenge on Fourteenth Amendment procedural due process grounds to N.J.A.C. 13:101-6.6(c) and 13:101-8.1(a).  Section 13:101-6.6(c) provides:

> Juveniles held in prehearing room restriction . . . shall receive a hearing within three days, including weekends and holidays, unless there are exceptional circumstances, unavoidable delays or reasonable postponements.  Should the third day fall on a Saturday, Sunday or holiday, the hearing shall be held on the weekday immediately following the weekend or holiday.

19

N.J.A.C. 13:101-6.6(c).   Section 13:101-8.1(a) provides:

>A juvenile may be placed in room restriction pending the hearing of disciplinary charges by a Disciplinary Hearing Officer, provided, however, that such prehearing room restriction shall be served only in a secure facility with an assigned Disciplinary Hearing Officer, and, shall be limited to, instances where the Superintendent or designee determines that prehearing room restriction is necessary for the safety of the juvenile, staff or other juveniles, or for the orderly operation of the facility.

N.J.A.C. 13:101-8.1(a).   According to the Amended Complaint, these provisions are facially unconstitutional because they permit "JJC to seclude a juvenile in prehearing room restriction . . . without any procedural due process, including the ability to consult with counsel, the right to a meaningful opportunity to be heard, and the right to appeal the decision."  (Am. Compl. ¶ 303.)

Finally, Count Twelve is a facial constitutional challenge on Fourteenth Amendment procedural due process grounds to the New Jersey Parole Board's policy of "prohibit[ing] attorneys from being present at initial, quarterly, or annual review hearings."[23] (Am. Compl. ¶ 309.)

---

[23]   Plaintiffs cite to section B2 of the First Edition of The Parole Book as containing this policy.  The Court notes that the identical provision remains in the most recent Fourth Edition of The Parole Book in section D10.  The challenged policy provides: "No one is permitted in the room during your hearing except Board staff and correction officers....  You cannot have an attorney present, but your attorney, like anyone else, may submit a letter to the Board panel on your behalf."

In *Turner v. Safley*, the United States Supreme Court held that four factors are relevant in reviewing allegations that a prison regulation infringes constitutional rights: whether the regulation has a "valid, rational connection" to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation.[24]   482 U.S. 78, 89-91 (1987).

Given the undeveloped record before the Court and the fact-sensitive nature of the *Turner* analysis, Defendants have not met their burden of demonstrating entitlement to judgment as a matter of law.

With respect to Count Twelve, the JJC Defendants argue that

---

[24]   Plaintiffs articulate the standard for facial constitutional challenges as whether "no set of circumstances exists under which the [the provision] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or whether the [provision] lacks any "plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997)(Stevens, J., concurring in judgments)(internal quotation marks omitted).  However, these standards are applied to facial challenges to statutes, not regulations.   *See U.S. v. Stevens*, 130 S.Ct. 1577, 1587 (2010). Since the challenged provisions here include a New Jersey Parole Board policy and sections of the administrative code, they are prison regulations and not statutes adopted through a legislative process.   Therefore, *Turner v. Safley* sets out the appropriate standard for analyzing Plaintiffs' constitutional challenges. *See Washington v. Harper,* 494 U.S. 210, 224 (1990)(*Turner* applies whenever "the needs of prison administration implicate constitutional rights"); *see also Overton v. Bazzetta*, 539 U.S. 126 (2003)(analyzing facial challenges to sections of Mich. Admin. Code under the *Turner* factors).

O'Neill's claim lacks merit "[b]ecause there is no constitutional right to counsel at parole hearings." (JJC Defs' Br. at 28.)   In *Swarthout v. Cooke*, the Supreme Court reaffirmed its earlier holding that the procedures required by the Due Process Clause in the context of parole release hearings are minimal.  131 S.Ct. 859, 862 (2011)(per curiam)(citing *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1, 16 (1979)).  Where a prisoner is allowed an opportunity to be heard and provided a statement of the reasons why parole is denied, the Constitutional standard is satisfied.  *Id.*

However, in light of the unique facts of this case, the Court finds that Defendants are not entitled to judgment as a matter of law on Count Twelve.  O'Neill is a juvenile allegedly subjected to unjustified, lengthy periods of emotionally and physically cruel conditions of isolation.  The undeveloped record before the Court does not present any factual details about what happened at O'Neill's parole release hearing.  In light of O'Neill's status as a juvenile and the undeveloped factual record, the Court cannot make a determination regarding this constitutional claim.[25]

---

[25]  Two recent cases from the Supreme Court rely on the distinct psychological and neurological attributes of juveniles in support of different treatment under the Constitution.  *See Graham v. Florida*, 130 S.Ct. 2011 (2010)(holding that life without parole sentences for non-homicide offenses violates the Eighth Amendment); *Roper v. Simmons*, 543 U.S. 551 (2005)(holding that execution of juveniles violates the Eighth and Fourteenth

Accordingly, Defendants have not met their burden and their Motions with respect to Counts Three, Eleven and Twelve will be denied.

## 2.

In Counts One and Seven of the Amended Complaint, Plaintiffs allege substantive due process violations under the Fourteenth Amendment for the conditions of their confinement, lack of medical care and a failure to protect from harm.

Defendants argue that these federal constitutional challenges are properly analyzed under the Eighth Amendment because Troy and O'Neill had already been adjudicated delinquent and were not pre-trial detainees.[26]  Plaintiffs contend that because punishment is not the primary goal for juveniles confined following delinquency adjudications, their constitutional claims should be evaluated under the Fourteenth Amendment, which applies to constitutional challenges by individuals confined for treatment purposes and those in pre-trial detention.[27]  (Pls' Br.

---

Amendments).

[26]  Defendants argue in the alternative that if this Court determines that the Fourteenth Amendment applies they are entitled to qualified immunity.  (JJC Defs' Br. at 29 n.6.)  The Court need not address this argument because it finds that the Eighth Amendment is the proper standard under which to evaluate Plaintiffs' claims.  *See* discussion *infra*.

[27]  While New Jersey's early mission with respect to juveniles was predominately one of rehabilitation, "punishment has now joined rehabilitation as a component of the State's core mission with respect to juvenile offenders."  *State v. Presha*,

in Opp. at 17.)   The Court will first consider the appropriate constitutional standard before turning to the merits of Plaintiffs' claims.

In considering constitutional challenges to conditions of confinement, courts distinguish between pre-trial detainees and convicted inmates.  Because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," that person "may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).  Thus, pre-trial detainees are protected from punishment under the Fourteenth Amendment's Due Process Clause.[28]  *Id.*  On the other hand, convicted inmates are protected only from punishment that is cruel and unusual under the Eighth Amendment.  *Id.* at 536 n.16; *see also Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005).

In the context of constitutional claims by juveniles who

---

163 N.J. 304, 314 (2000).  *See also* N.J.S.A. 2A:4A-21(b)(The Code of Juvenile Justice shall seek "to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program or supervision, care and rehabilitation, and a range of sanctions designed to promote accountability and protect the public.").

[28]  While a pre-trial detainee's rights with respect to medical care flow from the Fourteenth Amendment rather than the Eighth Amendment, the standard under both is the same: deliberate indifference to a person's serious medical needs.  *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 584 (3d Cir. 2004)*; Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).

have been adjudicated delinquent, the Third Circuit held that allegations concerning conditions of confinement and a failure to protect from harm "fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment." *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 261 (3d Cir. 2010). In *Betts*, the Third Circuit applied the more-specific provision rule to foreclose the juvenile's constitutional claims under the Fourteenth Amendment where he also brought claims challenging the same conduct under the Eighth Amendment. *Id.*

Plaintiffs rely on *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.,* 372 F.3d 572 (3d Cir. 2004), for the proposition that constitutional claims by juveniles should be analyzed under the Fourteenth Amendment rather than the Eighth Amendment. This is not a correct reading of the case. In analyzing the juvenile's constitutional claims, the Third Circuit relied on the accepted distinction between detainees and convicted prisoners. *Id.* at 584. Because the events forming the basis of the juvenile's constitutional claims occurred prior to his disposition hearing, the court deemed him a detainee and not a convicted prisoner. *Id.* at 576, 584. Thus, the court noted that "A.M.'s claims are appropriately analyzed under the Fourteenth Amendment since he was a detainee and not a convicted prisoner." *Id.* at 584.

In this case, Plaintiffs were not detainees, but adjudicated delinquent juveniles who had been committed to the custody of the

25

JJC when the actions giving rise to their constitutional claims occurred.  Therefore, their constitutional claims concerning their conditions of confinement, failure to protect from harm and lack of medical care should be analyzed under the Eighth Amendment.[29]

Plaintiffs' Eighth Amendment conditions of confinement, failure to protect from harm and inadequate medical care claims all require proof that prison officials acted with deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(failure to protect claim requires proof that the defendants were "deliberately indifferen[t] to a substantial risk of serious harm"); *Rhodes v. Chapman*, 452 U.S. 337, 346-48 (1981)(conditions of confinement claim under Eighth Amendment requires proof that living conditions are cruel or deprive prisoner of the necessities of life and that such conditions are the result of the prison officials' deliberate indifference); *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 584 (3d Cir. 2004)(inadequate medical care claim requires proof of deliberate indifference to a serious medical need).  In the

---

[29]   While it is true, as Plaintiffs point out in their Opposition Brief, that older cases from other circuits have applied the Fourteenth Amendment to juvenile conditions of confinement cases even where the juvenile had been adjudicated delinquent, *see e.g., A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1431-32 (9th Cir. 1987), the Third Circuit in 2010 has provided the standard this Court is bound to apply.  *See Betts*, 621 F.3d at 261.

Eighth Amendment context, the deliberate indifference element is a subjective test requiring actual knowledge on the part of prison officials. *See Kaucher v. County of Bucks*, 455 F.3d 418, 427 (3d Cir. 2006)(citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

The Mental Health Providers rely on Troy's Mental Health Progress Notes and Electronic Medical Records to demonstrate that they acted "in a manner irreconcilable with the term 'deliberate indifference.'" (Mental Health Providers' Br. at 16-17.) However, mere notations on a patient's medical charts do not offer this Court a sufficient basis from which to assess the intention and actual knowledge of the Mental Health Providers.

Given the undeveloped record before the Court and the fact-sensitive nature of the deliberate indifference analysis, the Court cannot make a determination at this time regarding the intent or subjective knowledge of the JJC Defendants or the Mental Health Providers, as required for Plaintiffs' conditions of confinement, failure to protect and lack of medical care claims.

Moreover, JJC Defendants' argument with respect to Troy's lack of medical care claim that they cannot be deliberately indifferent because Troy was under observation by the Mental Health Providers is unavailing. Although a prison official's mere failure to respond directly to the medical complaints of a

27

prisoner who is already being treated by the prison doctor is insufficient to establish deliberate indifference, *see Durmer v. O'Carroll*, 991 F.2d 64, 69 (1993), this is not consistent with Troy's claims.  The Complaint specifically alleges that JJC Defendants prevented Troy from receiving necessary medical treatment.  (*See* Am. Compl. ¶¶ 91, 96, 100, 105, 113.)  Thus, there is a genuine issue of material fact regarding whether Troy was prevented from receiving treatment from the Mental Health Providers, and JJC Defendants have not met their burden of demonstrating entitlement to judgment as a matter of law.

Accordingly, Defendants' Motions with respect to Counts One and Seven will be denied.[30]

**3.**

In Counts Four and Nine, Plaintiffs allege violations of procedural due process pursuant to 42 U.S.C. § 1983 in the use of pre-hearing room restriction for O'Neill and temporary close custody and special observation status for Troy.

The Fourteenth Amendment prohibits state deprivations of life, liberty or property without due process of law.  In

---

[30]  JJC Defendants also argue that Plaintiffs' conditions of confinement claim must fail because the physical conditions of the isolation room met industry standards, the room temperature was maintained on a 24-hour basis, and the finger foods were nutritionally adequate.  (JJC Defs' Br. at 32-33.)  However, Plaintiffs' conditions of confinement claim is broader than this argument suggests, and JJC Defendants have not met their burden with respect to Plaintiffs' plausible and well-pled conditions of confinement claim.

considering a procedural due process claim, courts must first "determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Evans v. Secretary PA Dep't of Correc.*, --- F.3d ---, 2011 WL 1833237, at *9 (3d Cir. 2011)(quoting *Newman v. Beard*, 617 F.3d 775, 782 (3d Cir. 2010)).

Procedural protections must be afforded even to prisoners before they are deprived of rights they retain while incarcerated. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). A convicted prisoner has a liberty interest where a restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "[T]he baseline for determining what is 'atypical and significant'--'the ordinary incidents of prison life'--is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Griffin v. Vaughn*, 122 F.3d 703, 706 (3d Cir. 1997).

If the court "determine[s] that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it." *Evans*, 2011 WL 1833237, at *9 (quoting *Newman*, 617 F.3d at 783)(internal quotation marks and citation omitted). This requires analysis of three factors: "First, the private interest that will be affected by the

29

official action; second, the risk of an erroneous deprivation of
such interest through the procedures used, and the probable
value, if any, of additional or substitute procedural safeguards;
and finally, the Government's interest, including the function
involved and the fiscal and administrative burdens that the
additional or substitute procedural requirement would entail."
*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

### *Troy*

Defendants' argument with respect to Troy's procedural due
process claims is twofold.  First, they rely on *Meachum v. Fano*,
427 U.S. 215 (1976), to argue that Troy had no right to
procedural due process for a transfer to a more restrictive
placement.  (JJC Defs' Br. at 20.)  Second, they argue that
process was available to Troy because he could request a change
in status by completing a form and returning it to his social
worker.  (*Id.*)

With respect to Defendants' first argument, they have not
met their burden of demonstrating entitlement to judgment as a
matter of law.  While *Meachum* held that the Due Process Clause
does not protect a prisoner from being transferred to an
institution with substantially more burdensome conditions, 427
U.S. at 225, transfers for mental health purposes are treated
differently.

In *Vitek v. Jones*, the United States Supreme Court held that

30

appropriate procedural safeguards are required before an inmate
could be transferred from prison to a state mental hospital.   445
U.S. 480, 493 (1980).  In reaching this decision, the Court noted
the major changes to conditions of confinement that would result
from such a transfer, which include greater limitations on
freedom of action and the stigmatizing consequences of a mental
illness diagnosis.  *Id.* at 492.  The Court concluded that
additional due process protections are necessary "[b]ecause
prisoners facing involuntary transfer to a mental hospital are
threatened with immediate deprivation of liberty interests they
are currently enjoying and because of the inherent risk of a
mistaken transfer."  *Id.* at 495-96.

While Troy was not transferred to a mental hospital, the
conditions of his confinement were substantially altered due to
medical professionals' determination of his mental health.[31]  As
noted *supra*, while isolated under special observation statuses
for 178 to 188 out of the 225 days he spent in JJC custody, Troy
was allegedly denied access to necessities that were readily
available to the general JJC population, including education,
physical recreation, access to peers, proper nutrition, court-

---

[31]  Special observation status was imposed by medical
professionals based on Troy's "mood, attitude, behavior,
participation in activities, hygiene, sleeping patterns, eating
habits, previous suicide attempts and whatever other information
deemed relevant to the particular situation."  (JJC Defs' Br. at
18)(citing N.J.A.C. 13:95-16.4.)

ordered counseling sessions, and all personal possessions, including pens and paper, clothing, and bedding.  The Court cannot say at this early stage in the litigation that the situation in this case is not analogous to *Vitek* where the prisoner had a liberty interest requiring additional procedural protections.

With respect to Defendants' second argument--that process was available to Troy because he could request a change in status by completing a form and returning it to his social worker--the Court is not persuaded that this satisfies the Constitutional standard.  *See supra* section III.A.

Accordingly, Defendants' Motions with respect to Troy's procedural due process claims will be denied.

<u>*O'Neill*</u>

Defendants argue first that O'Neill has no right to procedural due process regarding a transfer to a more restrictive placement.  Defendants also argue that "the disciplinary hearing process, which includes a right to receive written notice of the charges, a hearing, the right to present evidence and confront and cross-examine witnesses, and the avenue for appeal, satisfies the requirements of procedural due process under any measure of what would be due an institutionalized person."  (JJC Defs' Br. at 24.)

Plaintiffs contend that "Defendants repeatedly placed

32

O'Neill in a much more restrictive form of custody without an initial appearance before a neutral decision-maker.  He was not able to speak in his own defense until the disciplinary hearing, which usually occurred after 3-5 days of living in a punitive isolation cell."  (Pls' Opp. at 44-45.)  According to Plaintiffs, because O'Neill was placed in isolation for days prior to any hearing, he was not afforded the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law."  *Sandin v. Conner*, 515 U.S. 472, 485 (1995).  However, discipline which represents a "dramatic departure from the basic conditions" of a sentence may trigger due process protection.  *Id.*  In *Sandin*, the Court found that a prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  *Id.* at 486. In reaching this holding, the Court emphasized that the conditions of disciplinary segregated confinement mirrored conditions imposed upon inmates in administrative segregation and protective custody as well as for inmates in the general prison population who also experienced significant periods of lock-down time.  *Id.*

33

Given the undeveloped record in this case and O'Neill's
status as a juvenile, the Court cannot fully consider at this
stage of the litigation how *Sandin* would apply here.  As to the
process through which O'Neill could challenge his sanctions, the
Court does not find the record sufficiently developed to properly
consider whether it satisfies the dictates of due process based
on the relevant factors as set forth in  *Matthews v. Eldridge*,
424 U.S. 319 (1976).  Accordingly, Defendants' Motion with
respect to O'Neill's procedural due process claims will be
denied.

### C.

Defendants argue that the negligence claims in Counts Six
and Thirteen should be dismissed because Plaintiffs have failed
to abide by the notice requirements set forth in the New Jersey
Tort Claims Act, N.J.S.A. 59:8-8.  The JJC Defendants point out
that the Complaint was filed in this action on June 7, 2010 and
notices of claim were not filed until December 29, 2010.  (JJC
Defs' Br. at 40.)  Therefore, the JJC Defendants argue, because
Plaintiffs failed to file their notice of claims before they
filed suit, their negligence claims are barred and should be
dismissed.  (*Id.*)

The New Jersey Tort Claims Act provides:

A claim relating to a cause of action for . . . injury
or damage to person . . . shall be presented as
provided in this chapter not later than the ninetieth
day after accrual of the cause of action. After the

34

expiration of six months from the date notice of claim
is received, the claimant may file suit in an
appropriate court of law. The claimant shall be forever
barred from recovering against a public entity or
public employee if:

a. He failed to file his claim with the public entity
within 90 days of accrual of his claim except as
otherwise provided in section 59:8-9; or

b. Two years have elapsed since the accrual of the
claim; or

c. The claimant or his authorized representative
entered into a settlement agreement with respect to the
claim.

Nothing in this section shall prohibit an infant or
incompetent person from commencing an action under this
act within the time limitations contained herein, after
his coming to or being of full age or sane mind.

*Id.*

<u>*Troy*</u>

Plaintiff Troy filed a Complaint in June, 2010.  On December
29, 2010, a notice of claims was filed.[32]  Thus, Troy's claims
were technically premature, insofar as N.J.S.A. 59:8-8 provides
that suit may be filed "six months from the date notice of claim

---

[32]   Troy was born on March 21, 1993 and reached the age of
majority in March, 2011.  (*See* Lemane Cert. Ex. B.)  Therefore,
Troy filed suit and his notice of claim prior to reaching the age
of majority when the time limitations for commencing an action
would have begun to run.  Troy's early filing of his Complaint
and his notice of claim do not pose a problem under the Act,
which "provides that an infant is not precluded from commencing
an action by the section . . .[b]ut. . . extends the right of an
infant to bring his claim throughout the period of his minority."
*Barbaria v. Twp. of Sayreville*, 191 N.J. Super. 395, 402 (App.
Div. 1983) (citing *Vedutis v. Tesi*, 135 N.J. Super. 337, 340-41
(Law Div. 1975)).

35

is received," and Troy filed his timely notice of claim after first commencing suit.

However, as New Jersey courts have previously recognized, dismissal without prejudice is an "inappropriate" disposition where sufficient time has passed since the filing of the complaint and there has been no showing that the public entity has been "frustrated in undertaking an investigation of the claim." *Reale v. Twp. of Wayne*, 132 N.J. Super. 100, 111 (Law Div. 1975); *see also Guerrero v. Newark*, 216 N.J. Super. 66, 74-75 (App. Div. 1987). From the time this action was commenced in June 2010, Defendants have had sufficient opportunity to "investigate the claim" and possibly "work toward a settlement," which are the goals promoted by the six month waiting period. *Reale*, 132 N.J. at 111. Thus, the Court will not dismiss Troy's negligence claims.

## *O'Neill*

O'Neill was born on October 4, 1992 and reached the age of majority in October, 2010. (*See* Lemane Cert. Ex. E.) On December 2, 2010, an Amended Complaint adding Plaintiff O'Neill was filed. Since the notice of claims was filed in December, 2010, it was timely filed within 90 days of O'Neill reaching the age of majority. For the reasons stated above, O'Neill's negligence claims will not be dismissed merely because he filed suit prior to filing a timely notice of tort claim.

**D.**

Defendants argue that they are entitled to dismissal of Plaintiffs' punitive damages claims because the "record here is devoid of any facts or evidence indicating that the defendants acted with an 'evil motive' or 'callous indifference.'" (JJC Defs' Br. at 41.)

A plaintiff may recover punitive damages in a civil rights action under 42 U.S.C. § 1983 if the defendants' actions were done with "malice or reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 530 (1999). Thus, whether punitive damages are warranted is a fact-specific inquiry requiring examination of Defendants' intent and knowledge. Given the early stage of this litigation and the undeveloped record before the Court, a ruling on Plaintiffs' punitive damages claim is premature. Therefore, the Court will deny without prejudice Defendants' motions with respect to Plaintiffs' punitive damages claim.

**IV.**

For the reasons stated above, JJC Defendants and Mental Health Providers Motions for Summary Judgment will be denied. An appropriate Order accompanies this Opinion.

Dated: August 25, 2011

s/Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

37